UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

UNITED STATES OF AMERICA              :            **08 CR. 375 (RPP)**

   - v -                              :

**KYRONE DOUGHTY,**                    :

        Defendant.              :

------------------------------------------------------X


### DEFENDANT KYRONE DOUGHTY'S POST-HEARING REPLY TO THE GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS


LEONARD F. JOY, ESQ.
Federal Defenders of New York
Attorney for Defendant
**KYRONE DOUGHTY**
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (212) 417-8732

**PEGGY M. CROSS, ESQ.**


TO:   MICHAEL J. GARCIA, ESQ.
      United States Attorney
      Southern District of New York
      One. St. Andrew's Plaza
      New York, New York 10007
      Attn: **AMANDA KRAMER, ESQ.**
           Assistant United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA     :         **08 CR. 375 (RPP)**

     - v -            :

**KYRONE DOUGHTY,**        :

          Defendant.      :

-----------------------------------------------------X

**DEFENDANT KYRONE DOUGHTY'S POST-HEARING REPLY TO THE
GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS**

**INTRODUCTION**

The government bears the burden of establishing by a preponderance of the evidence that the stop and seizure of Kyrone Doughty on April 4, 2008, was lawful. Based on the evidence adduced at the hearing on July 18 and July 25, the government has failed to meet that burden. The police officer who decided to stop Mr. Doughty, Christopher Rodriguez, did not have a lawful basis for detaining him. When his partner, Steven Omisore grabbed Mr. Doughty's arm, he did not have a lawful basis for doing so. In consequence, Mr. Doughty's motion should be granted and any evidence discovered and statements made following his unlawful seizure should be suppressed.

**FACTUAL BACKGROUND**

Mr. Doughty was arrested on East 169th Street after 10:00 p.m. on April 4, 2008. (Tr. at 12). He was wearing dark clothing, including a long, baggy "hoodie." See Exh. A (Photograph of Kyrone Doughty, admitted into evidence as Defendant's Exhibit A at the

hearing).[1] Shortly after arresting Mr. Doughty, Officer Christopher Rodriguez explained his reasons for doing so. He filled out a "Stop, Question and Frisk Report Worksheet" report and explained that he stopped Mr. Doughty because of a "large bulge on [his] waistband" and because he had seen Mr. Doughty make "furtive" movements. See Exh. B at 1 (Stop, Question and Frisk Report Worksheet, admitted into evidence as Defendant's Exhibit J at the hearing) (hereinafter "Stop and Frisk Report").[2] At the July 18 hearing, Detective Joseph Fitzgerald testified that he had discussed the stop and arrest of Mr. Doughty with Officer Rodriguez and that Officer Rodriguez told him that he had observed "a bulge." (Tr. at 97). Indeed, Officer Rodriguez's purported observation of a bulge formed part of the basis for the Federal complaint against Mr. Doughty. See Exh. C (Complaint in United States v. Kyrone Doughty, 08 Mag. 0791) (Rodriguez "noticed [Mr. Doughty] put his hand on his waist and adjust a bulge in his waistband in a manner consistent with adjusting a firearm. [Mr. Doughty] maintained his hand on the bulge.").

Perhaps because the darkness and Mr. Doughty's clothing made it highly incredible that Officer Rodriguez was able to view a bulge on Mr. Doughty's waistband, Officer Rodriguez's testimony at the July 18 hearing differed materially from both the Stop and Frisk Report he completed and the account he gave to Detective Fitzgerald. Indeed, Officer Rodriguez testified multiple times that he could not even see Mr. Doughty's waistband, (Tr. at 47, 56), and he never mentioned seeing any kind of object on Mr. Doughty's person – let alone a large bulge

---

[1]     Officer Rodriguez did not voucher the "hoodie" Mr. Doughty was wearing the night of his arrest. (Tr. at 41).

[2]     On the Stop and Frisk Report, Officer Rodriguez did not indicate that any force was used in the encounter with Mr. Doughty. The first example of a type of force listed on the Stop and Frisk Report is "hands on suspect," but Officer Rodriguez did not check the box indicating an officer had placed his hands on Mr. Doughty. However, both officers testified at the hearing that Officer Omisore grabbed Mr. Doughty's arm. (Tr. at 15, 20, 73).

on his waistband – prior to the seizure of Mr. Doughty.

Officer Rodriguez testified that he first saw Mr. Doughty while he and his partner Steven Omisore were patrolling in an unmarked minivan, traveling eastbound on 169th Street at the intersection of Union Avenue shortly after 10:00 at night. (Tr. at 12). Officer Rodriguez testified that while he was driving he observed Mr. Doughty "standing with two other males" and he observed Mr. Doughty "adjust the left side of his waistband in a manner which seemed to me indicative of someone carrying a weapon." (Tr. at 12). He later demonstrated this movement. Officer Rodriguez placed his left hand at the front, center of his waist and slid it along his waist to his left hip. (Tr. at 55). After seeing this movement, he told his partner that he was going to stop Mr. Doughty. (Tr. at 62). Officer Rodriguez made clear that the decision to stop Mr. Doughty was his alone and that the decision was based on the movement of Mr. Doughty's hand. (Tr. at 56, 62). Indeed, Officer Omisore, testified that he did not even see Mr. Doughty until after Officer Rodriguez announced his intention to stop Mr. Doughty. (Tr. at 69). ("[O]fficer Rodriguez stated to me that he wished to stop a certain individual. That's when I first saw the individuals. That's why we stopped them."); id. at 79. Officer Rodriguez testified that after he made the decision to stop Mr. Doughty, but before he had done so, he noticed that Mr. Doughty "look[] side to side" by moving his eyes. (Tr. at 56). He demonstrated this as well, moving his eyes from right to left. (Tr. at 56).

Officers Rodriguez and Omisore approached Mr. Doughty and ordered him to show them his hands. Officer Rodriguez testified that Mr. Doughty raised his right hand and made a "furtive movement." (Tr. at 14). Officer Rodriguez demonstrated this "furtive movement." It was essentially the same movement he had witnessed from the minivan and consisted of moving his left hand along his waist area from the center toward his left side while rotating his body slightly counterclockwise. (Tr. at 58). In addition to describing the movement

as "furtive," Officer Rodriguez described the slight counterclockwise rotation of the body as "blad[ing]." (Tr. at 20). At this point, Officer Rodriguez testified that he "wanted to cut an angle, of what angle I could, in case [Mr. Doughty] did run." (Tr. at 20). Officer Omisore likewise used the term "bladed" and explained that "[i]t appeared as if [Mr. Doughty] wanted to step in a right direction." (Tr. at 71). Officer Omisore testified that when Mr. Doughty rotated slightly counterclockwise, Officer Omisore took a step toward him and grabbed his right hand. (Tr. at 72-73) ("Once again at the request of, let me see your hands, I approached [Mr. Doughty]. It seemed, when his body went to a different direction, I made a step toward that direction to make sure he wasn't able to flee. [Mr. Doughty], you know, seemed like – I'm sorry. Let me back up. When he did that motion, I stepped towards that direction. I grabbed [Mr. Doughty's] right hand . . . The hand he had up."). Officer Rodriguez was very clear that he did not see a gun until after his partner had grabbed Mr. Doughty's arm, (Tr. at 59), and Officer Omisore was equally clear that he did not see the gun until after Mr. Doughty was in custody. (Tr. at 73).

In support of his motion to suppress, Mr. Doughty submitted a declaration in which he denied engaging in any suspicious behavior, denied trying to run away from the police, denied that there was a visible bulge in his waistband, and denied adjusting or placing his hand on any bulge in his waistband. Exh. D ¶¶ 3, 5 (Declaration of Kyrone Doughty).

## DISCUSSION

A police officer may briefly detain and question an individual without a warrant only if the officer has reasonable suspicion that "criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 30 (1968); see also United States v. Arvizu, 534 U.S. 266 273 (2002), United States v. Padilla, 2007 WL 1958894, *4 (E.D.N.Y. June 19, 2007). In order to determine whether an officer's reasons for a stop are legally sufficient, a court must determine if the officer had a "reasonable suspicion, based on specific and articulable facts, of unlawful conduct." United

States v. Bayless, 201 F.3d 116, 132 (2d Cir. 2000); see also United States v. Scopo, 19 F.3d 777, 781 (2d Cir. 1994) (a detaining officer must have a "particularized and objective basis" for suspecting wrongdoing).   In Terry itself, the Supreme Court made clear that an officer's reasonable suspicion must be based on "the specific reasonable inferences which he is entitled to draw from the facts in light of his experience" and not on his "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 27.  Even where an officer has the requisite reasonable suspicion to stop and question an individual, the officer needs additional information to frisk or physically restrain that individual.  In order to justify a frisk, the officer must have an objectively reasonable belief that a person is armed and presently dangerous.  See, e.g., Ybara v. Illinois, 444 U.S. 85, 93 (1979) ("Nothing in Terry can be understood to allow a generalized 'cursory search for weapons' . . ."); United States v. Jaramillo, 25 F.3d 1146, 1151 (2d Cir. 1994) (in order to frisk for weapons, the police must have a reasonable belief that the individual is "armed and presently dangerous to the officer or other.").

Mr. Doughty was seized for Fourth Amendment purposes when Officers Rodriguez and Omisore announced themselves as police, demanded to see his hands, and Mr. Doughty responded by raising his right hand.  See Kaupp v. Texas, 538 U.S. 626, 629 (2003) ("A seizure of the person within the meaning of the Fourth Amendment occurs when, taking into account all of the circumstances surrounding the encounter, the police conduct could have communicated to a reasonable person that he was not at liberty to ignore the police presence.").  Indeed, like Mr. Doughty, neither of the two men on the sidewalk with Mr. Doughty felt free to ignore the police presence.  (Tr. at 14).  Thus, in order to justify their stop of Mr. Doughty, Officer's Rodriguez and Omisore had to have reasonable suspicion that Mr. Doughty was committing or about to commit a crime at the time they decided to announce themselves as

5

police and ask to see his hands. They did not.[3]

   Even if the Court credits Officer Rodriguez's hearing testimony – and the defense submits that it should not – it is clear that his reasons for stopping Mr. Doughty amount to nothing more than a hunch.[4] The hearing testimony on the totality of the information the officers possessed at the time Officer Rodriguez decided to stop Mr. Doughty was very clear: Officer Omisore had not yet noticed Mr. Doughty and Officer Rodriguez decided to stop Mr. Doughty "[b]ecause of the way he shifted the left side of his waistband." (Tr. at 62, 69). None of the other factors present – viewed as a whole or individually – give rise to reasonable suspicion. The so-called high crime area Officers Rodriguez and Omisore were assigned to patrol, the Forest and McKinley housing developments, (Tr. at 9), is not even depicted on the map introduced as Government Exhibits 1A and 1B. (Tr. at 33). Officer Rodriguez testified that Mr. Doughty looked at the unmarked minivan, Tr. at 61, but given that it was traveling at five miles per hour,

---

[3]  There is no question that Mr. Doughty had been seized by the time Officer Omisore grabbed his arm. At this point, neither officer had seen an object in his possession.

[4]  The defense contends that the Court should not credit Officer Rodriguez's testimony. In addition to the material differences between his testimony and the hearing and the Stop and Frisk Report and the information he passed on to Detective Fitzgerald, Officer Rodriguez's own testimony belies the notion that he was actually concerned that Mr. Doughty had a weapon. He testified that he told his partner he wanted to stop Mr. Doughty, but he did not warn him that he thought Mr. Doughty had a gun. Neither of the officers drew their guns as they approached Mr. Doughty and neither tried to warn or protect the individuals with whom Mr. Doughty was conversing. Additionally, the exchange between Officer Rodriguez and the Court regarding Government Exhibit 2B (the ammunition) casts doubt on the veracity of his testimony. When asked by the government if Government Exhibit 2B was in the same or substantially the same condition as when he first saw it, Officer Rodriguez testified "Yes. The only thing different is the tape on it." (Tr. at 24). Yet when the Court pointed out that one of the rounds appeared to have been fired, Officer Rodriguez said that no rounds had been fired the night of Mr. Doughty's arrest. The Court then clarified: "So that they aren't in the same condition as they were that night, is that correct?" And Officer Rodriguez responded "No, they weren't." Id. Even if the Court does credit Officer Rodriguez's testimony, however, he did not testify to facts that gave rise to objectively reasonable suspicion.

Tr. at 11, this is hardly suspicious.    Nor is the fact that Mr. Doughty looked from right to left suspicious, considering he was standing facing two men. (Tr. at 61-62).  As Officer Omisore described it, Mr. Doughty and the other two men "seemed to be in a discussion.  They were just talking to each other." (Tr. at 68).  Thus, at the time the officers decided to stop Mr. Doughty, they did not have a reasonable suspicion of unlawful conduct.

   Nor can the testimony that Mr. Doughty raised only one of his hands after his initial seizure by the officers render the stop constitutional.  See Illinois v. Wardlow, 528 U.S. 119, 125 ("refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure").[5]  Mr. Doughty did not engage in headlong flight at the sight of the officers.  He raised his left hand and asked what the officers wanted.  Then, as he rotated counterclockwise, Officer Omisore testified that he grabbed Mr. Doughty's right hand. This so-called blading – even considered in conjunction with the other circumstances observed by the officers – did not give rise to an objectively reasonable, particularized suspicion that Mr. Doughty had a weapon.  In consequence, the police encounter was unconstitutional and any observations the officers made or evidence they uncovered from this point on is a fruit of this unlawful conduct that must be suppressed.

   Courts within this Circuit have found reasonable suspicion for a Terry stop or frisk lacking under far more suspicious circumstances than those present here.  See, e.g., United

---

[5]  Officer Rodriguez testified that at this point, he thought Mr. Doughty was free to leave, but Officer Omisore testified that when a person refuses a police request to show their hands, it "may indicate either holding onto an object, whether it be a gun, whether it be a knife, or any objects, you know, clearly not visible." (Tr. at 72).  The government cannot have it both ways:  If Mr. Doughty was indeed free to leave, an indication that he was about to do so, such as the step Officer Omisore thought he was about to take, could not reasonably have raised the officers' suspicion.  Furthermore, the testimony of Officer Omisore makes clear that, at most, he had a hunch that Mr. Doughty may have been holding on to an object, but he could not articulate facts to support a reasonable suspicion that, even if there was an object, the object was a weapon. At this point, neither officer had seen any sort of bulge or object in Mr. Doughty's possession.

States v. Antuna, 186 F. Supp. 2d 138, 145 (D. Conn. 2002) (no reasonable suspicion for stop where officer spotted someone he thought was wanted, who quickly looked away upon seeing the police and then intently watched the police after they drove away); United States v. Crump, 62 F. Supp. 2d 560, 564 (D. Conn. 1999) (no reasonable suspicion for stop or frisk where officer believed defendant was deliberately trying to avoid vehicle checkpoint in a high crime neighborhood by turning his car around and then after being stopped began to walk away from officer, acted a little nervous, and placed his hands in his pocket); United States v. Arenas, 37 F. Supp. 2d 322, 327 (S.D.N.Y. 1999) (no reasonable suspicion for stop or frisk where officers spotted a group of three men that appeared to be falsely posing as tourists and walking in an unusual formation, entered a store with one man appearing to act as a lookout and upon making eye contact with the police, left the store, walked quickly away and placed a dark object in his jacket pocket).

Judge Gleeson's opinion in United States v. McCrae, 2008 U.S. District LEXIS 2314, 07-CR-722 (JG) (E.D.N.Y. January 11, 2008), is particularly instructive. In McCrae, a plainclothes officer patrolling a high crime area observed a group of people standing on the playground. One person in the group was smoking marijuana. The officer testified that he thought McCrae left the group at the sight of the police officers. He further testified that, as he walked away from the officer, McCrae made essentially the same movement that Officer Rodriguez testified he saw Mr. Doughty make. See id. at *2 (officer testified he observed defendant "move his hand as if moving an object from the center of his stomach to the left side of his waistband"). Like Officer Rodriguez, the officer in McCrae testified that this movement made him suspicious that McCrae might have a weapon because "he himself has made similar movements when adjusting his own firearm [and he] also observed other officers in plainclothes make similar movements." Id. at *3; Tr. at 16. And, like Officer Rodriguez, the officer in

8

McCrae testified that he thought the defendant was preparing to flee. But Judge Gleeson held that "[e]ven assuming [the officer] saw McCrae move in a fashion consistent with moving his hand from the center of his stomach to the left side of his waist, McCrae did not move in a sufficiently suspicious manner to justify the stop." Id. at *9-10.

Of course, so-called "furtive" movements can give rise to reasonable suspicion. See, e.g., United States v. Paulino, 850 F.2d 93, 97 (2d Cir. 1988). Indeed, Officer Rodriguez was careful to use that magic word during his testimony. See, e.g., Tr. at 58. As Judge Posner noted in United States v. Broomfield, 417 F.3d 654, 655 (7th Cir. 2005), "furtive" is a favorite term for describing the movements of a suspect because of its vagueness. Id. (urging courts not to credit "[s]uch subjective, promiscuous appeals to an ineffable intuition"). But the Court is not bound by Officer Rodriguez's characterization of Mr. Doughty's actions as furtive and the movement demonstrated by Officer Rodriguez does not objectively rise to that level. See Tr. at 58. Neither this movement, nor anything else in Officer Rodriguez's testimony – even if the Court credits it – was objectively, reasonably suspicious. Although Officer Rodriguez was careful to use reasonable suspicion buzz words in describing Mr. Doughty's actions, these actions could be indicative of many things. There were insufficient objective surrounding circumstances to give rise to a reasonable belief that Mr. Doughty had a weapon.

Where the totality of the circumstances is devoid of objectively suspicious behavior, the mere accumulation of otherwise innocent behavior does not sustain a lawful detention. Indeed, the defense contends that Officer Rodriguez's reliance on these otherwise innocent actions in his testimony at the hearing amounts to nothing more than an attempt to provide after-the-fact justification for his hunch that he should stop Mr. Doughty.

**CONCLUSION**

The evidence recovered as a result of the stop and seizure of Mr. Doughty on the night of April 4, 2008, should be suppressed. The police did not have a warrant, did not have probable cause to arrest Mr. Doughty and did not have an objectively reasonable and specific basis to believe that he was engaged in criminal activity or that he was armed and dangerous.

Dated: New York, New York
      August 18, 2008

                        LEONARD F. JOY, ESQ.
                        Federal Defenders of New York
                        Attorney for Defendant
                        **Kyrone Doughty**
                        52 Duane Street - 10th Floor
                        New York, New York  10007
                        Tel.:  (212) 417-8732

                        **PEGGY M. CROSS**

TO:    MICHAEL J. GARCIA, ESQ.
        United States Attorney
        Southern District of New York
        One St. Andrew's Plaza
        New York, New York  10007
        Attn.:  **AMANDA KRAMER, ESQ.**
              Assistant United States Attorney

# Exhibit A



# Exhibit B

COMPLETE ALL CAPTIONS

**STOP, QUESTION AND FRISK REPORT WORKSHEET**
PD344-151A (Rev. 11-02)

| | |
|---|---|
| Pct. Serial No. | |
| Date 7/3/08 | Pct. Of Occ. 042 |

Time Of Stop 22:20

Period Of Observation Prior To Stop 2 min

Radio Run/Sprint #

Address/Intersection Or Cross Streets Of Stop
804 E 169 st

☐ Inside ☐ Transit ☒ Outside ☐ Housing

Type Of Location Describe: Sidewalk

Specify Which Felony/P.L. Misdemeanor Suspected
CPW

Duration Of Stop 2 min

## What Were Circumstances Which Led To Stop?
### (MUST CHECK AT LEAST ONE BOX)

☐ Carrying Objects In Plain View Used In Commission Of Crime e.g., Slim Jim/Pry Bar, etc.
☐ Fits Description.
☐ Actions Indicative Of "Casing" Victim Or Location.
☐ Actions Indicative of Acting As A Lookout.
☐ Suspicious Bulge/Object (Describe)
☒ Other Reasonable Suspicion Of Criminal Activity (Specify)

☐ Actions Indicative Of Engaging In Drug Transaction.
☒ Furtive Movements.
☐ Actions Indicative Of Engaging In Violent Crimes.
☐ Wearing Clothes/Disguises Commonly Used In Commission Of Crime.

large bulge on waist band

| Name Of Person Stopped | Nickname/ Street Name N/A | Date Of Birth |
|---|---|---|
| Doughty, Tyrone | | 3/22/82 |

Address 808 E 169 st

Apt. No. N/A

Tel. No. N/A

Identification: ☐ Verbal ☒ Photo I.D. ☐ Refused ☐ Other (Specify)

Sex ☒ Male ☐ Female

Race: ☐ White ☒ Black ☐ White Hispanic ☐ Black Hispanic ☐ Asian/Pacific Islander ☐ American Indian/Alaskan Native

| Age 26 | Height 5'8 | Weight 200 | Hair BLK | Eyes BLK | Build Heavy |
|---|---|---|---|---|---|

Other (Scars, Tattoos, Etc.) B/K Boots / BLK sweatshirt

Did Officer Explain Reason For Stop
☒ Yes ☐ No

If No, Explain:

Were Other Persons Stopped/ Questioned/Frisked?
☐ Yes ☒ No

If Yes, List Pct. Serial Nos.

If Physical Force Was Used, Indicate Type:
☐ Hands On Suspect
☐ Suspect On Ground
☐ Pointing Firearm At Suspect
☐ Handcuffing Suspect
☐ Suspect Against Wall/Car

N/A

☐ Drawing Firearm
☐ Baton
☐ Pepper Spray
☐ Other (Describe)

Was Suspect Arrested?
☒ Yes ☐ No

Offense CPW 3

Arrest No. B08628297

Was Summons Issued?
☐ Yes ☒ No

Offense

Summons No.

Officer In Uniform?
☐ Yes ☒ No

If No, How Identified? ☒ Shield ☐ I.D. Card
☒ Verbal

DEFENDANT'S EXHIBIT J - 10

3501-L

**Was Person Frisked?** ☒ Yes ☐ No   **IF YES, MUST CHECK AT LEAST ONE BOX**

☐ Inappropriate Attire - Possibly Concealing Weapon
☐ Verbal Threats Of Violence By Suspect
☐ Knowledge Of Suspects Prior Criminal
   Violent Behavior/Use Of Force/Use Of Weapon
☐ Other Reasonable Suspicion of Weapons (Specify) _Furtive_

☐ Furtive Movements
☐ Actions Indicative Of
   Engaging In Violent
   Crimes

☐ Refusal To Comply With Officer's Direction(s)
   Leading To Reasonable Fear For Safety
☐ Violent Crime Suspected
☒ Suspicious Bulge/Object (Describe) _Can see 38 Revolver_

**Was Person Searched?** ☒ Yes ☐ No   **IF YES, MUST CHECK AT LEAST ONE BOX**

☐ Outline Of Weapon   ☐ Other Reasonable Suspicion of Weapons (Specify) _Arrest_

☒ Hard Object   ☐ Admission Of Weapons Possession
☐ Assault Weapon ☐ Knife/Cutting Instrument

**Was Weapon Found?** ☒ Yes ☐ No   If Yes, Describe: ☒ Pistol/Revolver ☐ Rifle/Shotgun
☐ Machine Gun ☐ Other (Describe) _in the gun_

**Was Other Contraband Found?** ☐ Yes ☒ No If Yes, Describe Contraband And Location _____

Demeanor Of Person After Being Stopped _nervous_

Remarks Made By Person Stopped _arrest the gun_

**Additional Circumstances/Factors:** (Check All That Apply)

☒ Report From Victim/Witness
☐ Area Has High Incidence Of Reported Offense Of Type Under Investigation
☐ Time Of Day, Day Of Week, Season Corresponding To Reports Of
   Criminal Activity
☐ Suspect Is Associating With Persons Known For Their Criminal Activity
☐ Proximity To Crime Location
☐ Other (Describe)

☐ Evasive, False Or Inconsistent Response To Officer's Questions
☐ Changing Direction At Sight Of Officer/Flight
☒ Ongoing Investigation At Sight Of Officer/Flight
☐ Sights And Sounds Of Criminal Activity, e.g., Bloodstains, Ringing
   Alarms

Pct. Serial No. _____   Additional Reports Prepared; Complaint Rpt No. _____   Juvenile Rpt. No. _____   Aided Rpt. No. _____   Other Rpt. (Specify) _____

REPORTED BY: Rank_ Name (Last, First, M.I.)
Print _P.O. Rodriguez, C._
Signature _____

Tax# _633_
Command _____

REVIEWED BY: Rank_ Name (Last, First, M.I.)
Print _Sgt. Ortega_
Signature _14-09#_

Tax# _____
Command _633_

# Exhibit C

Approved:    _Glen Kopp_
             GLEN KOPP
             Assistant United States Attorney

Before:      HONORABLE JAMES C. FRANCIS
             United States Magistrate Judge
             Southern District of New York    08 MAG    0791

- - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA        :    SEALED
                                     COMPLAINT
        v.                      :    Violation of
                                     18 U.S.C. § 922(g)(1)
KYRONE DOUGHTY,                 :
                                     COUNTY OF OFFENSE:
            Defendant.          :    BRONX

- - - - - - - - - - - - - - - -x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        JOSEPH FITZGERALD, being duly sworn, deposes and says that he is a Detective with the Gun Enhancement Unit of the New York City Police Department, and he charges as follows:

### COUNT ONE

        On or about April 3, 2008, in the Southern District of New York, KYRONE DOUGHTY, the defendant, after having been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, to wit, a conviction on or about February 6, 2006, in New York Supreme Court, Bronx County, of Criminal Possession of a Controlled Substance in the Third Degree, in violation of New York Penal Law 220.16, a Class B Felony, unlawfully, willfully, and knowingly did possess in and affecting commerce, a firearm, to wit, a loaded .38 caliber Taurus firearm, which previously had been shipped and transported in interstate and foreign commerce.

        (Title 18, United States Code, Section 922(g)(1).)

        The bases for my knowledge and for the foregoing charge, is, in part, as follows:

        1.    I am a Detective in the Gun Enhancement Unit of the New York City Police Department ("NYPD"), and I have been personally involved in the investigation of this matter.  This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my

conversations with other law enforcement agents and other individuals.  Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

　　　　2.　　I have spoken with an officer of the NYPD ("Officer-1"), who informed me of the following, in substance and in part:

　　　　a.　　On April 3, 2008, at approximately 10:20 p.m., Officer-1 and another officer of the NYPD ("Officer-2") were on a routine patrol in an area in the Bronx, New York which had recently experienced a spike in crime, including a string of robberies and a homicide.  The Officers were in plain clothes and were driving an unmarked patrol vehicle with tinted windows.

　　　　b.　　Officer-1 observed KYRONE DOUGHTY, the defendant, standing on the sidewalk, facing the street, as he was speaking with two individuals.  Officer-1 noticed DOUGHTY appear to stare at his vehicle and try to peer into the tinted windows. As DOUGHTY stared at the Officers' vehicle, Officer-1 noticed DOUGHTY put his hand to his waist and adjust a bulge in his waistband in a manner consistent with adjusting a firearm. DOUGHTY maintained his hand on the bulge.

　　　　c.　　The Officers stopped their vehicle and exited.  As the Officers approached KYRONE DOUGHTY, the defendant, and the other two individuals, Officer-1 again observed DOUGHTY with his hand covering a bulge in his waistband as if he was holding a firearm.

　　　　d.　　The Officers announced that they were police officers and asked DOUGHTY to show them his hands.  DOUGHTY only lifted one hand in response, maintaining his other hand over the bulge in his waistband.  Officer-1 asked DOUGHTY to show him is other hand, and DOUGHTY said, "what's the problem officer?" DOUGHTY again refused to remove the one hand from covering the bulge in his waistband.

　　　　e.　　KYRONE DOUGHTY, the defendant, then tried to run away from the Officers.  Officer-2 grabbed DOUGHTY's arm before he could get away.  DOUGHTY tried to break free from Officer-2.  As DOUGHTY was being held by Officer-2, Officer-1 noticed DOUGHTY grab for his waist where he observed the handle

-2-

of a firearm.

        f.    Officer-1 approached KYRONE DOUGHTY, the defendant, and observed a firearm in DOUGHTY's hand.  Officer-1 grabbed DOUGHTY's hand, and the firearm fell to the ground. Officer-1 procured the firearm and the Officers arrested DOUGHTY.

        3.    I have conferred with a Special Agent of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("Special Agent-1") regarding the firearm's origin and shipment.  According to the Special Agent, who has specialized training and knowledge regarding firearms manufacturing, the .38 caliber Taurus firearm was not manufactured in the State of New York.

        4.    I have reviewed criminal history records pertaining to KYRONE DOUGHTY, the defendant, which reflect that he was convicted on or about February 6, 2006, in New York Supreme Court, Bronx County, of Criminal Possession of a Controlled Substance in the Third Degree, in violation of New York Penal Law 220.16, a Class B Felony.

        WHEREFORE, the deponent respectfully requests that a warrant be issued for the arrest of KYRONE DOUGHTY, the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.

JOSEPH FITZGERALD
Detective
New York City Police Department

Sworn to before me this
9th day of April 2008

UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

JAMES C. FRANCIS IV
UNITED STATES          MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

-3-

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA            :            **08 CR. 375 (RPP)**

    - v -                                              :

**KYRONE DOUGHTY,**                    :

          Defendant.              :

-----------------------------------------------------X


## DECLARATION OF KYRONE DOUGHTY

    I, KYRONE DOUGHTY, hereby declare under the penalties of perjury, pursuant to 28 U.S.C. § 1746, that:

1.    I am the defendant in the above captioned criminal case, and I make this declaration in support of a motion pursuant to Rules 12(b)(3) and 41 of the Federal Rules of Criminal Procedure to suppress physical evidence and statements obtained from me by law enforcement authorities in violation of my constitutional rights.  Since the only purpose of this declaration is to show that my constitutional rights were violated, I have not included every detail of what occurred.

2.    After 10:00 on the night of April 3, 2008, I was standing on East 169th Street in the Bronx when I was approached by New York Police Department officers.

3.    Prior to the time they approached me, I was not engaged in any suspicious behavior such as staring at the officers' car or peering into car windows.

4.    As a result of my encounter with the police, they recovered a gun from me.

5.    I did not try to run away from the police.  At no time prior to the recovery of the gun was

there a visible bulge in my waistband nor did I adjust a bulge in my waistband. At no time during my encounter with the police did I place my hand on a bulge in my waistband.

Dated:   Brooklyn, New York
              June 12, 2007

_Kyrone Doughty_
Kyrone Doughty